Bridges v. Poe, please take your time. I have with me Courtney Douglas, who is not admitted, but I understand from the check-in, is that okay with the court? I've got no objection. She's admitted to the bar. Congratulations. Mr. Osment, we are ready when you are. My name is Frank Osment and I represent the appellants. First of all, thank you for granting the oral argument. I hope it is an opportunity to fruitfully explore a couple of the more difficult issues in the case, or at least I found more difficult to address in writing. So with that in mind, I apologize. There was a misstatement in the brief. We did not argue that the city of Jasper lacks a written policy to prohibit sexual exploitation of women in custody. Our brief did include a remark to that effect without a citation to the record, and that was an error. My apologies for that. Wait, wait, wait. So that's a misstatement, an accidental misstatement? Yes, sir. Okay. Yes, sir. Thank you for the correction. I think that's a cut-and-paste error. Just so long as it wasn't an A.I. error. Otherwise, I am hopeful that A.I. will ultimately improve the quality of my life. That one is evidence that there is opportunity. I think the first question that is a little out of the box with respect to these claims is, or stems from, the fact that the supervisors here, Chief Poe and Ms. Johnson, testified that they lacked actual knowledge that sexual misconduct, custodial sex violations, were occurring in custody. And we did not have anyone to testify that they directly caused or that someone directly told them about those violations. And, of course, in prior decisions of this court, the court has ruled or has stated a general rule and also has generally noted an exception. The general rule is that unless the supervisor has actual notice that something is necessary, you know, to change about the way the police do their business or jailers do their business, in the absence of that actual knowledge, they do not have an obligation to do anything. The exception to that general rule is that there are some situations that are just so obvious that you're sort of unnoticed. I hate to characterize it as constructive notice, but you're unnoticed that something is necessary. So how does that apply to this case? These women were all in custody when they were sexually exploited. In our brief, we discussed some cases that comment and remark on what is probably within the general kin of this panel, which is to say that custodial sex violations are not uncommon. I don't understand where you're going with this. They happen in jails. They're not uncommon. Therefore, there's vicarious liability for them. No. Therefore, every jailer and deputy jailer is on notice. They have to do something beyond what they're already doing, which is prohibiting it. Yes. That is our point, although I would characterize it somewhat differently. I wouldn't say that it's fairly prevalent. I would say that it's common and widespread and that a jailer and a deputy in particular—not a jailer and a deputy. I'm sorry. This is a municipal jail. A jailer and a policymaker would at least have to have some policy, as they did here, a written policy, that prohibits sexual exploitation and that they would further need to educate their people on what to do when that occurs. Because what happened here, Judge Carnes— When you say their people, educate their— But what to do when that occurs, meaning—I mean, I would think the main point would be not to do it, not to handle it in a certain way when it occurs. And to report it when it occurs, because here—I'm sorry, Judge Carnes. No, I'm sorry. I'm waiting to hear who knew about it and didn't report it. Raven Clay. Shortly after Stacey Bridges was released from custody in May of 2017, she said to Raven Clay, you know about what was going on with Dennis in the jail and, you know, I was performing oral sex on him, etc. and so forth. So Raven said, please—or not please, but you should get a lawyer, right? Now, Stacey did not make that report until she was released from custody. But the point of that report and what that report demonstrates is that Raven did not know that this was something that she needed to escalate. Later— But Ms. Clay didn't testify that she told me that, but I didn't know to escalate it. She didn't testify that. She testified that it didn't happen. Yeah. So you're arguing for a policy that, so far as the evidence discloses, wouldn't have made any difference. I beg your pardon? You've got to, if you're arguing for a policy, for a principle, for a holding that we haven't yet made and this court hasn't made, you've got to at least show us how it would have made a difference in this case. Because when it was reported, right, it stopped. When Charity Tessner, who was the last woman to be sexually exploited, managed to make this information available to outside law enforcement, outside law enforcement— I'm sorry. I'm sorry. The sworn testimony of Clay is it didn't happen. Now, it doesn't convince me that you point to somebody else who said, I believe it did happen and reported, or I've heard it happen and reported. Clay says she never heard anything about it. So if you have a policy, if you hear something about it, you've got to report it. That doesn't help you with somebody who's sworn under penalty of perjury, they didn't hear anything about it. It does not by itself carry the day, but it's not the only thing. And the next thing that happened, one of the subsequent things that happened, is that Monica Softley got wind from, I think, another inmate that there was sexual misconduct in the jail. She reported it, she said, to Deb Johnson. Nothing happened. No investigation. No nothing. Let me ask you this. Your brief, I believe, says, or somebody's brief says, in November of 2017, she was told that. Do we know when in November of 2017? When Ms. Softley told Ms. Johnson? Yes. I believe that was prior to the release date of Charity Kessler. It was released on January 10 or 11 of 2018, so it would be. But the reason I ask is Mann was released on November 9 of 2017. That's right. And so it depends on when. I mean, if Mann's released, and then somebody tells a jailer that there was bad things going on, that doesn't help the one. I mean, you can't argue, if they had just known to report it, what they were told after somebody was released, it would have avoided that plaintiff's injury. And I think, if I'm going to try to restate what you're saying to make sure I answer your question and address your concern, and that is to say, you're saying, well, maybe that helps Charity Kessler. Right. But that doesn't help. Well, you're representing five, aren't you? Six. Six. Okay. Five, it doesn't help. One, it might help, if we adopted your position, for which I don't know there's any precedent. But if we adopted it. I was just trying to pin the dates down, but we've got the record. We'll see if there's a date in there or not. I see that I'm basically out of time for my argument, but if I don't address your question, I'll sit down and let these gentlemen speak. Thank you. Thank you. May it please the Court. Good morning. I'm Courtney Crowder, and I represent the City of Jasper, Alabama, and its Police Chief, J.C. Poe. Tim Donahue represents Deb Johnson, a jail supervisor, and Terry Sides represents Dennis Busby, a jailer who was named in the Stacey Bridges lawsuit but was not served. Counselor, my first question to you is, number one, you have the Prison Rape Elimination Act, in which Congress found that sexual assault of inmates and prisoners is rampant in this country. Alabama, in particular, has been identified as a bad actor on that front. And then you have a jail, which either the plaintiffs would say turned a blind eye to the behavior that the women in the jail were exposed to, or did not do enough to ensure that they were actually being housed in a safe place. My question is, how many individuals would it take to establish that there is a custom or practice in the jail that allows the assault of inmates, particularly women? Well, we know that one has been determined to not be enough, and I don't think there, to my knowledge, has been a ruling beyond that. I would suggest that the conduct would have to be so flagrant and obvious as to rise to the level of a custom or policy of this municipality that they ignored or delivered a different standard. What about, I think there was in the record a woman who complained about being sexually assaulted, but then said, but please don't tell anyone. As opposed to what I understand to be a mandatory reporting requirement on jailers or correction officers when there are ever complaints about that kind of behavior. What significance, if any, should we place on the fact that there was at least one person and perhaps others who did share these reports, but because of a reasonable sense of fear, did not want to escalate it themselves to a formal complaint? Should we still place any weight on even those types of complaints? Yes and no. I don't mean to be ambiguous about the answer, but you're talking specifically regarding Stacy Bridges, who made a report to Ravenclay after she was out of jail. And at that time she asked Ravenclay, in her words, her testimony, don't tell anybody about that. Ravenclay went beyond that and said, if she had told me, I knew to report the conduct. So that's the basis for why Clay says, I didn't know. Because if Clay had known, it would have been reported. She says she would have reported it. And she said, as Judge Carnes pointed out, that that did not happen. Would there have been any consequences to her for failing to report it, if she had known about it? As to Ravenclay? The only evidence that would be in the record as to that is the affidavit of Stacy Chapman, another female jailer who actually worked on the shifts with Dennis Bussey and Justin Boyden's conduct at the issue in this case. She said that she, first of all, she didn't observe anything, any improprieties. But if she had, she would have been, have reported it also without fear of repercussion. So there's no evidence in the record that anyone did not report anything because of fear of repercussions or the good old boy network. There's nothing to that effect in this case. What about Johnson? I thought there was some evidence that Johnson was specifically told but then dismissed it or said something like, don't worry about it, I'm not going to say anything. What about that information and knowledge? Yes, ma'am. Deb Johnson testified that her memory was that what was reported to her in the jail was dirty talk, not an act of sexual abuse. That is her memory of what happened. Is dirty talk appropriate? No, ma'am. I can't remember what the record says about what steps this has taken once this abuse came to light. Is there anything that you can tell us about that? Yes, ma'am. The two things that occurred were Rusty Boyd, whose conduct is mainly at issue in the five of the six cases, was suspended. Secondly, Jerry Tesler was transferred to another jail. And third, the SBI conducted an investigation into what had happened. And he was suspended. Is he back at the jail now? He resigned shortly after he was placed on suspension. Thank you. And that happened fairly quickly after the report, didn't it? After the report reached the authorities in the jail. Your Honor, my memory is it happened almost immediately. I think the day that the SBI appeared, which was January the 10th of 2018, I think the transfer was started that day, if not conducted that day, and I think the suspension likewise was that day. And I might add, it is also my understanding that at that time, there was no report of any misconduct at the time, January the 10th, other than of Rusty Boyd. So while Dennis Buzzard was still there, who was complained of in the Stacey Bridges case, there was no report as to his conduct. So the only person that was reported to be complained about was Rusty Boyd, and he was immediately suspended. So Boyd, let's say, is one individual who assaults multiple women, is not the same as a custom or practice where you have multiple officers assaulting, allegedly, a smaller group of women? No, I'm not saying that at all. I'm saying that Rusty Boyd's conduct did not rise to a level of deliberate indifference to the city, Poe, or Johnson. Maybe give us some why on that. Would it be different if three people perhaps had committed the same number of assaults that Mr. Boyd allegedly committed? I'm sorry, Your Honor, I'm not following you. The number of people, it all goes to whether the city, Poe, or Johnson, had subjective knowledge of what those jailers were doing. So you think that if the city had knowledge that one jailer was making regular assaults on women, that would be sufficient, in the same way that it would be sufficient if the city had knowledge that multiple jailers were making regular assaults on women? One file policymaker had knowledge. Right. Yes. Okay. To hold the city. To hold city life. Right. But not to hold the individual, official, individually loved. Yes, Your Honor. Right. I say I'm over. Thank you. Thank you. Donahue. Please record. Good morning. I'm Tim Donahue, and I represent Deb Johnson in her individual capacity. And Judge Kugler was correct in finding that Deb Johnson was entitled to qualified immunity in her individual capacity. At best, the appellants can show that Ms. Johnson, on one occasion, received an unwritten report from Monique Softley that one of the plaintiffs was conducting a dirty talking going on in the jail, and that would be between the report that was received, it was between Ms. Tessner and Jonathan Long, another jailer, not Boyd. This one incident does not give Johnson early enough rise to the level of substantial evidence or persistence of a widespread practice or reoccurring incidents that led to a policy of practice. This one incident does not support that Johnson had subjective knowledge of a practice that amounted to deliberate indifference. Is that because, as Johnson characterizes it, it's just dirty talk as opposed to a description of an actual act involving individuals with an outcome? Well, her report was that Jonathan Long and Charity Tessner were exchanging in dirty talk, and she said she just forgot about it. That was her testimony, and I know that's what she testified in her deposition. Now, if you looked into it, Ms. Tessner testified that it was not Jonathan Long that she had problems with in the jail. It was Rusty Boyd. So even to the best case scenario, Ms. Johnson went and asked Ms. Tessner, you know, problems with Jonathan Long. She said, I don't have any problems with Jonathan Long. She testified she had no problems with Jonathan Long. But the point is just one occasion this Court has held is not enough to give subjective notice to a person or rise to the level of deliberate indifference. This Court has held that to hold a supervisor liable for constitutional violations, the plaintiffs must show that she either directly participated in the conduct,  which no one testified to that, or that there's a casual connection between her actions and the constitutional violation. A casual connection can be established when there's a history of widespread abuse, which we do not have here. What we have here is one single incident at best. That that custom, which we don't have a custom. We have one report that we know that she received, but that doesn't mean that there wasn't a history of widespread, or evidence of a history of widespread abuse, right? There was no knowledge to anybody at the City of Jasper anything was going on. Right, right. But that's a different question. I'm just trying to distinguish between what she was told about versus what is alleged to have happened. Well, what she was told was dirty talking. What they allege was sexual intercourse. And this was done by Monique Softley, who said she remembers specifically it was November the 5th of 2017 when she told Johnson. And then during the course of her deposition, we proved to her that she didn't even work on November 5th of 2017. So then she changed her testimony to be, well, it was sometime in November. That's the best, and the record is void as to exactly when it happened in November. Or if it happened, well, the dirty talking did happen, because we got notice of that to my client. But the exact date, we do not know. That has not been established. And as a result, this one incident, appellants have failed to show a widespread practice. Nothing ever got to POE. And that was the testimony. Judge Kuhn references, and I'm anticipating a question on that, there were some other incidences that occurred that may have been able to put Ms. Johnson on notice. However, none of those ever got to Johnson or none of those ever got to POE. They were either told by Clay that Clay said it didn't happen. Tessner told Softly that don't tell anybody. Well, if it doesn't get reported and it's not, then it can't be investigated, and it can't amount to widespread abuse in practice. Well, I mean, it can amount to widespread abuse in practice. It just can't amount to widespread abuse that she knew about, right? One incident, being contrary to what this court has held in the past. I'm not talking about the one incident. I'm talking about the other allegations that she was not told about, according to the evidence. I'm sorry I'm not following you there, Judge. There are numerous allegations about sexual activity that was forced on women. And I think your point is the only incident that your client was told about was an incident of dirty talk. So that's not enough to show that she was aware of all the other alleged incidents. But all I'm trying to drill down on is it's different to say that she didn't know about it or have a reason to know about it, versus there's no evidence that those other incidents happened. Well, Ms. Johnson testified that if she knew, she would have taken it serious and investigated it if all these other things had come to her attention. Right. I'm not asking you to concede anything that I think is going to, you know, put your client in a bad position. I wouldn't expect you to do that. But my only point is there is evidence that these other things happened. But generally speaking only for myself, they would also need evidence that she was aware of it or should have been aware of it. I'm just trying to make sure that we're in agreement that it appears to have been a very bad situation. Now, what we do with that next legally versus certain individuals and entities is a different question. Correct. Okay. Well, with that, I don't have anything further unless the Court has any questions. Thank you. Mr. Sides. Good morning. May it please the Court, I'm appearing on behalf of Dennis Busby who was only a defendant in the Stacey Bridges case. In both her primary and reply brief, the plaintiff confessed that she is not appealing the District Court's rulings as to Mr. Busby. So with that, unless this Court has any questions for me, I yield the rest of my time. So you're not asking for an affirmation because by definition we can't affirm what hasn't been appealed? That's correct. All right. You just want us to leave it alone, basically. Leave me alone. Leave me alone. I don't know. All right, Mr. Osmond. You've got five minutes. Thank you. Let's address, if we may, Jonathan Long for a moment. There was some discussion about who had notice or who did what and what reports were made. Busby, you know, Johnson, and then Jonathan Long. There was a report, as you heard, suggesting that Jonathan Long was involved in this conduct. And, in fact, there wasn't merely a report. There was at least a preliminary indication and a written report prepared by what I still call the ABI, the Alabama Bureau of Investigation. They may have changed to SBI by that time. And that report actually named him as someone suspected. He heard about all that shortly before he gave his deposition in this case. That is, if you will, an illustration of the lack of seriousness with which these types of things were treated. Yes, Mr. Boyd was dismissed. Nobody even asked Mr. Long about that. Did they know to ask? They entered the report yesterday. Yes, but the report came afterwards. I mean, the report was, I'm with you, the report was by the ABI after they were called in following the scandal. Right. So they couldn't have taken any action promptly before they found out about that, could they? No, they couldn't have. But the fact that they received a report naming somebody as a suspected sexual predator, quite frankly, and did nothing about it indicates that perhaps Raymond Clay and others would not have reported this had, you know, no matter how much they knew about it. But they wouldn't have reported it had they known about it. They didn't know about it, so hold them liable. That's a syllogism I have a little difficulty with. We believe they did know about the sexual misconduct. Our client testified, our client, Stacy Bridges, testified that she told Raymond Clay about the sexual misconduct. They knew about it when they got, or they had reason to suspect sexual misconduct when they received a written report from the ABI, and even then they didn't do anything about it. It doesn't show causation, but what it does show, I would humbly submit to you, Judge Carnes, is that if people were serious about investigating and reporting sexual misconduct in the Jasper Jail, they'd say, well, you know, we got this thing with Rusty Boyd. Jonathan, what's this about? Nobody talked to him before he gave his deposition. So that is the significance of that, and that's all the significance of it. And the SBI report says he committed sexual abuse? It identified him as a suspect. I don't think it was. No, it did not determine that he committed sexual abuse. Did it determine that somebody said he did? That is my understanding of those conclusions. Is the report in the record? Yes, it is. Is it in the report in the record? Yes. Okay. I want to make sure that I'm not misunderstanding or missing something pretty significant. Is it the case that Mr. Boyd was not a defendant in any of these cases? He is not a defendant in these cases. Why is that? Yes. Because we made claims under the Trafficking Victim Protection Act, and under the act, the government has the right, if they bring a claim, to stop your civil action. And when we commenced these actions, he had been charged with sexual misconduct. In fact, he's never been arraigned. And there has been no TVPA. The other reason is lawsuits, civil lawsuits, cost a lot. They're about time and recovery and so forth, and they're about money. And what Rusty Boyd did, as opposed to what others might have done, it's almost certainly uninsured because it would be an intentional act. And, in fact, the women in the case were named as defendants in an action brought by the insurance company. And, in fact, we commenced, we tried to add the insurance company ourselves to determine coverage. But it would have been a fruitless effort. Thank you. Do you agree that if you can establish that there was a customer policy promoting this kind of widespread sexual abuse, you have no TVPA claim? Your Honor, I do not concede that. So then what would be the basis of us moving forward and reviewing that particular claim, other than the fact that the evidence in support of that is also pretty thin? Well, the evidence is that, at least with respect to three of the women who were trustees, they were actually coerced, within the meaning of the TVPA, in providing sex, and that that was, in the case of those women who were trustees, they were actually performing services for the city in the way of washing cars, preparing meals, doing laundry, etc., things that people had to be hired to do after the women were released from custody. So, under the TVPA, if you're talking about people who are, you know, forced to coerce, or coerced into performing a sexual act, and those people are doing something that benefits you, and you benefit from it, then you have liability for that if you knew or you had reason to know, and I think this is where your question about widespread attractiveness comes in. Reason to know is very key when you're talking about a hotel corporate umbrella, right? The people who actually knew here were the people who were employees of the city. They were actually coercing the sex, you know, and otherwise supervising the meal preparation, laundry, and so forth. So it's not like the city can say, we didn't know, their own employees were engaged in it. So that's why we think that is not necessary. Let me ask you this quick question. How is that different from vicarious liability? It is vicarious liability, which under the TVPA is allowed. I thought you were still on one now. It would not be vicarious liability. That would not be enough to carry the day all by itself. Is that all for the panel? Yes, thank you for your arguments. We've got two more cases, but I think we'll take about a 10-minute break, so we'll see everyone back here at 5 till.